Kurtis B. BORRE, Petitioner–Appellee,

v.

UNITED STATES of America,
Respondent–Appellant.

No. 90–1632.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 12, 1990.

Decided Aug. 5, 1991.

William Hedrick (argued), O'Keefe, Lewis & Bruno, Skokie, Ill., for petitioner-appellee.

Joseph Duffy, Ira H. Raphaelson, Robert W. Kent, Jr. (argued), Asst. U.S. Attys., Crim. Div., Chicago, Ill., for respondent-appellant.

Before WOOD, Jr., and EASTERBROOK, Circuit Judges, and GRANT, Senior District Judge.* **

HARLINGTON WOOD, Jr., Circuit Judge.

In 1980, an affiliate of the United States Cable Corporation ("United States Cable") sought a cable television franchise from the Village of Fox Lake, Illinois ("Fox Lake"). The affiliate was unwilling, however, to subject itself to the uncertainty of competitive bidding, and sought to secure the award by means of an under-the-table payment. Lee Lovett, an attorney acting as an agent of the affiliate, offered and

---

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

** This opinion has been circulated among the judges of this court in regular active service. A majority did not favor a rehearing *en banc* on the question of a possible conflict with *Toulabi v. United States*, 875 F.2d 122 (7th Cir.1989).

gave a 5% ownership interest in the franchise to Richard Hamm, the mayor of Fox Lake, for Hamm's assistance in securing the approval of Fox Lake's Board of Trustees. Hamm, in turn, recruited Board member Richard Gerretsen by offering him a 2% interest. Kurtis Borre, in exchange for a 1% interest, agreed to act as a nominee for the purpose of concealing Hamm's and Gerretsen's interests in the affiliate. In January 1981, the Board of Trustees awarded a cable television franchise to the affiliate.

Borre, for his role in the scheme, was charged in the first and fifth counts of an April 1985 indictment. Count I charged Borre under 18 U.S.C. § 371 (conspiracy to commit an offense against the United States). Count V charged Borre under 18 U.S.C. § 1341 (mail fraud). Pursuant to a plea agreement, Borre pleaded guilty to both counts and was sentenced to five years of probation on each count, the sentences to run concurrently.

■ After learning that a codefendant's convictions had been vacated under *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987),[1] Borre sought relief under 28 U.S.C. § 2255.[2] The district court vacated Borre's conviction for mail fraud under the rationale that the objective of the underlying scheme did not constitute a property interest under *McNally*. As to the conspiracy count, the district court found it ambiguous, interpreted it as charging a conspiracy to commit mail fraud, and vacated it under *McNally* as well. An order to this effect was entered on October 16, 1989, just over one year before Borre's term of probation would have expired.

## I.

■ As an initial matter, we must clarify the very narrow parameters under which Borre's convictions may be reviewed. Borre's arguments were raised in a petition filed under 28 U.S.C. § 2255, which limits relief to "an error of law that is jurisdictional, constitutional, or constitutes a 'fundamental defect which inherently results in a complete miscarriage of justice.'" *Carreon v. United States*, 578 F.2d 176, 179 (7th Cir.1978) (quoting *Davis v. United States*, 417 U.S. 333, 346, 94 S.Ct. 2298, 2305, 41 L.Ed.2d 109 (1974)); 28 U.S.C. § 2255. Borre also pleaded guilty to the charges, and "[o]nce a plea of guilty has been entered, non-jurisdictional challenges to the constitutionality of the conviction are waived and only the knowing and voluntary nature of the plea may be attacked,"[3] And in addition to restraints on the types of issues that may be raised, the failure to raise issues on direct appeal bars a petitioner from raising them in a section 2255 proceeding unless he or she makes a showing of good cause for and prejudice from that failure.[4] It is against this backdrop that we first address Borre's mail fraud conviction.

## II.

By 1987, the mail fraud statute had significantly expanded the prosecutorial reach of United States attorneys. Its language, which criminalized schemes or artifices "to

---

1. Congress has largely negated the effect of *McNally* by subsequently defining "property" under the mail fraud statute to include intangible rights. *See* Act of Nov. 18, 1988, tit. VII, § 7603(a), 102 Stat. 4508 (codified at 18 U.S.C. § 1346).

2. Our case law makes it clear that a defendant serving a term of probation is "in custody" for purposes of section 2255. *See, e.g., Frank v. United States*, 914 F.2d 828, 829 & n. 1 (7th Cir.1990).

3. *United States v. Brown*, 870 F.2d 1354, 1358 (7th Cir.1989) (citing *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)); *see also United States v. Broce*, 488 U.S. 563, 570, 109 S.Ct. 757, 762–63, 102 L.Ed.2d 927 (1989) ("A guilty plea 'is more than a confession which admits that the accused did various acts.' It is an 'admission that he committed the crime charged against him'") (citation omitted).

4. *Williams v. United States*, 805 F.2d 1301 (7th Cir.1986) ("cause and prejudice" standard applies even when conviction arises from guilty plea), *cert. denied*, 481 U.S. 1039, 107 S.Ct. 1978, 95 L.Ed.2d 818 (1987); *see also Theodorou v. United States*, 887 F.2d 1336, 1339 (7th Cir.1989) (district court cannot reach merits of appealable issue in section 2255 proceeding unless issue is raised in "procedurally appropriate manner").

defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," 18 U.S.C. § 1341, had been interpreted broadly with regard to property interests, *see, e.g., Durland v. United States,* 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896), as well as those interests that really had nothing to do with property. Indeed, every court of appeals addressing the issue concluded that the statute's use of the disjunctive "or" after "to defraud" would allow prosecution under the theory that victims had been deprived of "intangible rights" such as the right to honest public officials and the right to corruption-free government. *McNally,* 483 U.S. at 358, 107 S.Ct. at 2880.

■ *McNally* changed all of that by holding that the mail fraud statute encompassed only property rights; the "to defraud" language would not independently support a prosecution under the intangible rights theory and intangible rights would not otherwise fall within the statute's broad definition of property. *Id.* at 358–60, 107 S.Ct. at 2880–81. But setting aside for a moment this unanticipated interpretation of the mail fraud statute, the underlying facts required only a straightforward application of a very simple rule: if an indictment issues solely under an invalid theory and the jury instructions allow conviction solely under an invalid theory, then any resulting conviction is invalid. *See id.* at 361, 107 S.Ct. at 2882 ("the jury instruction on the substantive mail fraud count permitted a conviction for conduct not within the reach of § 1341").[5] The prosecutor in *McNally* pursued only an intangible rights theory. When that theory was invalidated, nothing remained to support the defendants' convictions.

■ *McNally*'s interpretation of the mail fraud statute raised a jurisdictional issue that was clearly the proper subject of a

postconviction petition under section 2255. The case was not decided, moreover, until well after Borre was convicted (establishing good cause for failing to raise the argument earlier), and a retroactive application of *McNally* could invalidate Borre's conviction for mail fraud (meeting the prejudice element of *Williams* ). *United States v. Lovett,* No. 87 C 8978 (85 CR 284), 1988 WL 53246 (N.D.Ill. May 16, 1988); *see Toulabi,* 875 F.2d at 123–25. We have the ability, therefore, to delve into the merits of Borre's challenge.

Had it gone before a jury, Borre's case promised to be a reenactment of *McNally.* The indictment charged, *inter alia,* that Borre and his cohorts deprived Fox Lake and its citizens of the faithful and honest services of Mayor Hamm as well as the right to corruption-free government. The government relied heavily on these intangible rights theories at the trial of one of Borre's codefendants, *see Lovett,* No. 87 C 8978, and it is a fairly safe bet that the government would have pursued those same theories to persuade the jury of Borre's guilt. Borre pleaded guilty, however; he brought the process to a close before the government had the opportunity to commit what in retrospect would have been a fatal mistake.

■ Borre's guilty plea does not resolve the *McNally* question, but it certainly alters the analysis. In contrast to those cases involving defendants who invoked their right to a jury trial, the government's use of an intangible rights theory need not be fatal when the defendant has entered a plea of guilty. *See United States v. Eckhardt,* 843 F.2d 989, 997 (7th Cir.) (guilty plea), *cert. denied,* 488 U.S. 839, 109 S.Ct. 106, 102 L.Ed.2d 81 (1988); *see also Toulabi,* 875 F.2d at 125 (noting that indictment could state offense under mail fraud statute even though it was "brimming with the buzz-words of the intangible rights doc-

---

5. This general rule holds true, moreover, even if the indictment and jury instructions state a valid theory as well, *see Toulabi v. United States,* 875 F.2d 122, 123 (7th Cir.1989) ("If a jury could have founded its verdict on the intangible rights doctrine, we set the judgment aside *even though the indictment might have supported a verdict*

*on a proper charge.")* (emphasis added), the one exception being those cases in which "the government could not logically prove one scheme without proving the other since the elements of the two were identical." *United States v. Wellman,* 830 F.2d 1453, 1463 (7th Cir.1987).

trine"); *cf. Ranke v. United States,* 873 F.2d 1033 (7th Cir.1989) (plea of nolo contendere). As outlined in *Eckhardt* and *Ranke,* we look first to the indictment to determine whether any of the charges to which Borre pleaded guilty are sufficient to state an offense. *See generally* FED.R. CRIM.P. 7(c). If so, then the indictment is valid and we must determine whether Borre pleaded guilty to conduct that is consistent with the portion of the indictment deemed sufficient under *McNally.* If either of these criteria is not satisfied, then we must affirm the district court's decision to vacate Borre's mail fraud conviction. *See Eckhardt,* 843 F.2d at 996–98; *see also Ranke,* 873 F.2d at 1036–37.

### A. The Indictment

Count V of the indictment, the mail fraud count, charged that the defendants:

[D]evised and intended to devise and participate in a scheme to defraud:

(a) the Village of Fox Lake and its citizens of their right to the legal, faithful and honest services of Richard Hamm in the performance of acts related to his public employment;

(b) the Village of Fox Lake and its citizens, its public officials and its public employees of the right to have the business of the Village of Fox Lake conducted honestly, fairly and impartially, free from collusion, partiality, dishonesty, conflicts of interest, and fraud;

(c) the Village of Fox Lake and its citizens, its public officials and its public employees of the right to make a cable television franchise award with full disclosure of ownership interests; and to obtain the Village of Fox Lake cable television franchise contract by means of false and fraudulent representation and promises, knowing them to be false when made....

The government concedes that the first two theories are invalid but argues that the third theory alleges a deprivation of property in the form of a cable television fran-

chise. If valid, the third theory would support Borre's conviction because it is "easily separable" from the remainder of the indictment. *See Ranke,* 873 F.2d at 1035 & n. 3; *Eckhardt,* 843 F.2d at 997.

In order to find that the indictment is valid, however, the circumstances of this case require an affirmative answer to two separate questions. First, did Fox Lake have a property interest in its cable television franchise? Second, did the scheme to which Borre subscribed defraud Fox Lake of that property interest within the meaning of the mail fraud statute?

### 1. The Existence of a Property Interest

■ *McNally* tells us that the mail fraud statute "is limited in scope to the protection of property rights." 483 U.S. at 360, 107 S.Ct. at 2882. It does not really define "property," however; we are told merely that the term is "to be interpreted broadly," *id.* at 356, 107 S.Ct. at 2880 (citing *Durland,* 161 U.S. 306, 16 S.Ct. 508), but not so broadly as to include intangible rights. *Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), announced that "property" may be tangible or intangible, but again the language of the opinion says little about whether a cable television franchise falls within the statutory term.

*Carpenter* nevertheless provides an answer to the question before this court. To support its conclusion that confidential business information "has long been recognized as property," *id.* at 26, 108 S.Ct. at 320, the Court cited, *inter alia, Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1001–04, 104 S.Ct. 2862, 2871–73, 81 L.Ed.2d 815 (1984), and *Dirks v. SEC,* 463 U.S. 646, 653 n. 10, 103 S.Ct. 3255, 3260 n. 10, 77 L.Ed.2d 911 (1983). Both of these opinions relied exclusively upon state common law in announcing that confidential business information was a species of property.[6] Indeed, *Monsanto* recalled the "basic axiom that '[p]roperty interests ... are not created by

---

6. *Monsanto,* 467 U.S. at 1001–04, 104 S.Ct. at 2871–73 (using Restatement of Torts to determine if deprivation of commercial data was "taking" under fifth amendment); *Dirks,* 463

U.S. at 653 n. 10, 103 S.Ct. at 3260 n. 10 (referring to common law duty not to mismanage corporate assets, "of which confidential information is one").

the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.' "[7] It is logical, therefore, for this court to look to state law in determining whether a cable television franchise constitutes "property" for purposes of the mail fraud statute.

This approach is by no means novel; the Eleventh Circuit in addressing similar facts has taken precisely this same course. In *United States v. Italiano*, 701 F.Supp. 205 (M.D.Fla.1988), the defendant bribed a local government official in order to secure the award of a cable television franchise. The indictment charged that one of the objectives of the scheme was to deprive the local government of its cable television franchise, an objective that the defendant asserted was invalid under *McNally*. The district court rejected this challenge, expressing some doubt as to the other objectives but nevertheless finding *McNally* inapplicable because the franchise constituted property for purposes of the mail fraud statute. *Id.* at 207. The Eleventh Circuit affirmed, reasoning that cable television franchises were considered property both generally and specifically under state law. *United States v. Italiano*, 894 F.2d 1280, 1285 & n. 6 (11th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 246, 112 L.Ed.2d 205 (1990); *see United States v. Italiano*, 837 F.2d 1480, 1492–93 (11th Cir.1988) (Owens, C.D.J., dissenting) (citing 27 FLA.JUR.2D *Franchises From Government* § 2 (1981)).

The state law in this case leads us to the same conclusion reached by the Eleventh Circuit. Illinois courts have long embraced Blackstone's characterization of a franchise as "a royal privilege, or branch of the king's prerogative, subsisting in the hands of a subject." 2 W. BLACKSTONE, COMMENTARIES *37; *see, e.g., Marnik v. Northwestern Packing Co.*, 400 Ill. 66, 70–71, 79 N.E.2d 54, 57 (1948); *Chicago C.R.R. v. People ex rel. Story*, 73 Ill. 541, 547 (1874). Defined in this manner, it is clear that a franchise "does not belong to the citizens of a country generally by common right." *Lasher v. People*, 183 Ill. 226, 233, 55 N.E. 663, 665 (1899). Instead, a franchise is "[a] right which belongs to the government when conferred upon the citizen" and a right that "inhere[s] in the sovereign power." *Id.; see also California v. Central Pac. R.R.*, 127 U.S. 1, 40, 8 S.Ct. 1073, 1080, 32 L.Ed. 150 (1888) (franchise involves transfer of rights previously held exclusively by sovereign). And while Blackstone, *Marnik*, *Story*, *Lasher*, and *Central Pacific* are by no means contemporary authorities, their views are fully in line with "[t]he modern tendency ... to regard a [cable television] franchise as a delegation of a governmental function to private entities to be performed in the furtherance of the public welfare...." 1 D. FERRIS, F. LLOYD & T. CASEY, CABLE TELEVISION LAW § 13.13, at 13–68.11 (1990).

Our conclusion is buttressed by the fact that cable television franchises, like public utilities, may be operated by a municipality. Municipally operated cable systems now exist in no fewer than fifty-one cities in twenty states, and that number is on the rise.[8] In recognition of this trend, moreover, the Illinois General Assembly has recently passed legislation that expressly permits municipal operation of cable television fran-

---

**7.** 467 U.S. at 1001, 104 S.Ct. at 2871 (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161, 101 S.Ct. 446, 450, 66 L.Ed.2d 358 (1980) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972))).

**8.** Gilgoff, *Cities Climb into Cable Wars; Poor Service, High Rates Spark Some to Compete*, Newsday, Aug. 27, 1989, at 27 (Business); *see also Consolidated Telev. Cable Serv., Inc. v. City of Frankfort*, 857 F.2d 354 (6th Cir.1988) (making reference to thirty-nine year history of municipally operated cable television franchise in Frankfort, Kentucky); R. JACOBSON, MUNICIPAL CONTROL OF CABLE COMMUNICATIONS (1977) (municipal cable systems operating in twenty cities in fourteen states; planned or under evaluation in additional thirteen cities).

Some of these franchises were expressly authorized by statute, but not all. *See, e.g., City of Issaquah v. Teleprompter Corp.*, 93 Wash.2d 567, 611 P.2d 741 (1980) (en banc) (upholding municipal operation of cable television franchise despite fact that Washington law did not expressly authorize such operation).

chises.[9] Municipal operation is also permitted by Congress [10] and has consistently survived constitutional attack. *See, e.g., Warner Cable Communs., Inc. v. City of Niceville,* 911 F.2d 634 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991); *Consolidated Telev. Cable Serv., Inc. v. City of Frankfort,* 465 F.2d 1190, 1192–93 (6th Cir.1972) (equal protection and due process challenges); *see also City of Issaquah,* 93 Wash.2d 567, 611 P.2d 741 (rejecting first amendment challenge to municipally owned cable franchise).

As should be evident from this discussion, Fox Lake's cable television franchise is readily distinguishable from the regulatory licenses that we analyzed in *Toulabi;* a cable television franchise represents far more than a mere "promise not to interfere" by the government. 875 F.2d at 125.[11] This should come as no surprise, moreover, for both the United States Supreme Court and the Illinois Supreme Court have characterized the granting of a franchise as a legislative, not a regulatory, act.[12]

The mechanics of cable television also support this distinction. "Community antenna television" or cable television is a simple concept; the operator collects signals by erecting an antenna on a high exposed site and subsequently transmits those signals to subscribers by means of coaxial cables. Anyone can improve reception by erecting a higher antenna, but the clearer signals are of only limited use without a distribution system, and a distribution system requires a physical carrier for the cables. "[A] cable operator must lay the means of his medium underground or string it across poles in order to deliver his message," [13] and the affirmative creation and use of easements and rights of way are thus part and parcel of the cable television franchise. ILL.REV.STAT. ch. 24, para. 11–42–11(c); *see* 47 U.S.C. § 541(a)(2).[14]

9. ILL.REV.STAT. ch. 24, para. 11–42–11 ("In municipalities with less than 2,000,000 inhabitants, the corporate authorities may own (or lease as lessee) and operate·a community antenna television system.").

10. *See* 47 U.S.C. § 533(e) (permitting ownership by a "State or franchising authority" so long as that entity does not exercise editorial control over programming).

11. In *Toulabi,* the defendant sold entrance exam answers to applicants for chauffeur licenses and arranged for the licenses to issue without a check on the applicants' immigration status. This court, in vacating the defendant's convictions under *McNally,* held that taxi licenses did not constitute property in the hands of the issuing city because they were no more than mere promises not to interfere. 875 F.2d at 125.

12. *E.g., Central Pac. R.R.,* 127 U.S. at 40–41, 8 S.Ct. at 1080–81; *Withers v. City of Granite City,* 23 Ill.2d 156, 160, 177 N.E.2d 181, 183 (1961); *People v. Commonwealth Edison Co.,* 376 Ill. 70, 74, 32 N.E.2d 902, 904 (1941); *see People ex rel. Better Broadcasting Council, Inc. v. Keane,* 17 Ill.App.3d 1090, 1097, 309 N.E.2d 362, 367 (1st Dist.1973) (grant of cable television franchise is legislative act).

13. *Community Communications Co. v. City of Boulder,* 660 F.2d 1370, 1377 (10th Cir.1981); *cert. dismissed,* 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982).

14. Of course, many franchisees have entered into leasing arrangements for the use of existing utility company poles. *See FCC v. Florida Power Corp.,* 480 U.S. 245, 247, 107 S.Ct. 1107, 1109, 94 L.Ed.2d 282 (1987). Assuming that the existing poles are sufficient and that the utility company is willing, a franchisee may be able to establish the major portion of its distribution system without municipal assistance, subject only to regulation of the rates, terms, and conditions of such "pole attachments." ILL.REV.STAT. ch. 24, para. 11–42–11; *see* 47 U.S.C. § 224 (FCC may regulate rates, terms, and conditions of "pole attachments," but only in absence of "State" regulation or in absence of "State" compliance with specified procedural requirements). If existing poles are unsatisfactory, however, or if the utility company refuses to lease space on its poles, the municipality may exercise its right of eminent domain to obtain an easement on behalf of the franchisee. ILL.REV.STAT. ch. 24, para. 11–42–11(c); *see* 47 U.S.C. § 541(a)(2).

Utility poles, moreover, are of limited assistance; the franchisee must still be able to extend its cables into the homes and apartments of subscribers. Here, too, the municipality may under certain circumstances exercise its right of eminent domain. Illinois law provides that no "property owner, condominium association, managing agent, lessee or other person in possession or control of any residential building" shall interfere with the desire of "any occupant, tenant or lessee of any such building" to receive cable television service. ILL.REV.STAT. ch. 24, para. 11–42–11.1(a). The franchisee may install facilities to allow the requesting occupant, tenant, or lessee to receive service; if more than three occupants, tenants, or lessees request ser-

### 2. Whether the Scheme Defrauded the Victim of That Property Interest

Armed with the conclusion that the cable television franchise was Fox Lake's property, we must next determine whether Fox Lake was defrauded of that property within the meaning of the mail fraud statute. Borre argues (as does the dissent) that Fox Lake was not defrauded because it suffered no out-of-pocket loss, but neither *McNally* nor this circuit's precedent compels such a conclusion. Quite to the contrary, we have held that "[i]t is not necessary that a plan actually result in financial loss as long as it is aimed at the fraudulent deprivation of some of the victim's money or property." *United States v. Cosentino,* 869 F.2d 301, 307 (7th Cir.) (citing *United States v. Dial,* 757 F.2d 163 (7th Cir.1985)), *cert. denied,* 492 U.S. 908, 109 S.Ct. 3220, 106 L.Ed.2d 570 (1989); *see also United States v. Bailey,* 859 F.2d 1265, 1276 (7th Cir.1988) (upholding scheme that had " 'substantial potential to take other people's property by fraud' ") (quoting *United States v. Keane,* 852 F.2d 199, 205 (7th Cir.1988)). Most relevant to the present case, we have held that a victim is defrauded of property when the victim loses control over the disposition of that property.

In *Ranke,* an employee of a general contractor received kickbacks for his efforts in arranging for a subcontractor to receive extra work orders. After being charged with and pleading nolo contendere to mail fraud, the employee attempted to invalidate his conviction by claiming that the subcontractor not only did the work for which the general contractor was billed but also absorbed the cost of the kickbacks. As such, the employee argued that the general contractor was not out-of-pocket any money and, therefore, that the general contractor had not been defrauded within the meaning of the mail fraud statute. 873 F.2d at 1037–38.

Accepting for the sake of argument the assertion that the general contractor might not have suffered an out-of-pocket loss, we nevertheless upheld Ranke's conviction for mail fraud. Relying on language from *McNally,* 483 U.S. at 360, 107 S.Ct. at 2881 we concluded that the general contractor had been defrauded of property because it "was induced to part with its [property] on the basis of the false premise, implicitly represented to it by Ranke and [the subcontractor], that Ranke would not receive a portion of that [property]." 873 F.2d at 1040. The general contractor lost control over the disposition of its property, and that loss of control was deemed sufficient to validate the mail fraud conviction.

The circumstances are similar in this case, where there has been and continues to be no allegation that Fox Lake would have netted a higher franchise fee or would have secured the services of a superior franchisee in the absence of the scheme to which Borre subscribed. Just as in *Ranke,* however, Fox Lake and its citizens were induced to part with their property—the cable television franchise—on the implicit representation that Hamm and Gerretsen would not receive a portion of it. And just as in *Ranke,* Fox Lake did not bargain to give property to its own officials; " 'it is preposterous to claim' " that Fox Lake would have transferred a 5% interest to Hamm or Gerretsen as part of the deal. *Id.* at 1040 (quoting *United States v. George,* 477 F.2d 508, 513 (7th Cir.1973)). The secret agreement between the defendants meant that Fox Lake lost control over the disposition of its property, and that loss of control satisfies the requirements of the mail fraud statute.[15]

### B. The Plea Hearing and Plea Agreement

Having concluded that the indictment is valid, we must next determine

---

vice, then the franchisee may install facilities throughout most of the remainder of the building. *Id.* The statute makes it clear that this is a compensable "taking" of property, and the Supreme Court agrees. *See Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).

15. The scheme in this case is distinguishable from the one in *McNally* for the same reason that the scheme in *Ranke* was distinguishable. *Ranke,* 873 F.2d at 1040.

whether Borre pleaded guilty to conduct that is consistent with the theory outlined in the indictment. In neither the written plea agreement nor the guilty plea hearing was there any mention of Fox Lake's loss of its right to corruption-free government. Instead, Borre acknowledged that he had falsely represented that he held a 5% interest in a local cable franchise in order to conceal the interests of two public officials. This acknowledgment, viewed in combination with the fact that Borre's indictment survives scrutiny, is sufficient to validate Borre's conviction.[16]

### III.

Count I of the indictment, the conspiracy count, charged as follows:

> A statute of the State of Illinois involving bribery, Illinois Revised Statutes, Chapter 38, Sections 33–1(a), (d) and (e) was in effect.... This statute provided as follows: ... [text of statute quoted].
> 2. From in or about April, 1980 and continuing until the date of this indictment ... [others and] KURTIS BORRE, defendants herein, combined, conspired, confederated and agreed with each other and divers other persons known and unknown to the grand jury to commit an offense against the United States, to wit: to travel in interstate commerce with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of bribery under the laws of the State of Illinois, an unlawful activity as that term is defined in Title 18, United States Code, Section 1952(b)(2), in violation of Title 18, United States Code, Section 1952(a)(3); which conspiracy is described

as follows: [describes conspiracy, including overt acts].

....

In violation of Title 18, United States Code, Section 371.

The district court observed that Count I cited three statutes—18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 1952(a) (Travel Act); and ILL.REV.STAT. ch. 38, paras. 33–1(a), (d), (e) (bribery)—and then concluded that this citation of multiple statutes made the indictment ambiguous. The district court also noted that the plea agreement made mention of mail fraud, but not the Travel Act. Resolving these perceived flaws against the government, the district court concluded that Count I really charged a conspiracy to commit mail fraud and was therefore invalid because the objective of the scheme did not constitute a property interest for purposes of the mail fraud statute.

■ Deprived of the underlying premise that a franchise is not property for *McNally* purposes, the district court's reasoning collapses. There is a more fundamental problem, however. Under the district court's reading, Count I contained *two* charges: (1) conspiring to commit an offense against the United States; and (2) traveling in interstate commerce with the intent to carry on an "unlawful activity" (in this case, bribery in violation of Illinois law). The district court then gave no effect to the Travel Act citation and concluded that the conspiracy count related to mail fraud, even though Count I contains no citation to the mail fraud statute. The "offense against the United States" in "(1)," however, is clearly the Travel Act violation outlined in "(2)," and Count I thus contains only *one* charge—conspiracy to violate the Travel Act.

**16.** There is some temptation, perhaps, to stop here. Borre was serving a concurrent sentence and the so-called "concurrent sentence doctrine" might justify an avoidance of the remaining conviction because our decision would not affect the length of Borre's sentence; whether one conviction or two, he would still serve the same amount of time. Our own cases, however, undercut the rationale behind the concurrent sentence doctrine; we have held that "the vacation of a concurrent sentence might lead the sentencing judge to reconsider a sentence not vacated." *United States v. Holzer*, 848 F.2d 822, 824 (7th Cir.), *cert. denied*, 488 U.S. 928, 109 S.Ct. 315, 102 L.Ed.2d 333 (1988); *see United States v. Davenport*, 929 F.2d 1169, 1172 (7th Cir.1991) ("Although the judge imposed concurrent sentences, our practice in vacating a conviction underlying a concurrent sentence is to remand for resentencing on the valid counts. The idea behind the practice is that the judge may have sentenced the defendant more heavily on those counts thinking erroneously that he was guilty of additional crimes.") (citing *United States v. Boulahanis*, 677 F.2d 586, 591 (7th Cir.1982)). We therefore proceed to a discussion of Borre's remaining conviction.

■ Borre's remaining arguments fare no better. As an alternative to his *McNally* argument, Borre argues that Count I must fail "due to its lack of clarity in charging and the absence of any factual basis to support a conviction thereunder." Borre, however, has waived this argument by failing to raise it in his section 2255 petition. If the indictment and the plea agreement were for these reasons deficient, moreover, then they were always deficient, and Borre could (and should) have raised his arguments at an earlier time. Having declined to make that effort, he must make a showing of good cause for and prejudice from that failure, a burden that he has likewise not attempted to satisfy.[17]

## IV.

Our review of Borre's petition discloses no basis for upsetting his convictions. The judgment of the district court is RE-VERSED.[18]

EASTERBROOK, Circuit Judge, concurring in part and dissenting in part.

Borre pleaded guilty to mail fraud and conspiracy to commit an offense against the United States. He was sentenced to concurrent terms of five years' probation. The district court granted Borre's petition under 28 U.S.C. § 2255, holding that *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), vitiates the prosecution's theory of mail fraud and that the conspiracy charge is vague. I agree with the majority that the conspiracy conviction is valid. Having reinstated it, we should stop. Whether Borre also committed mail fraud no longer matters. It does not affect the length of his probation, which expired before the district judge set aside the convictions. The district judge did not impose a fine, or even a $50 special assessment, on account of mail fraud. Cf.

*Ray v. United States*, 481 U.S. 736, 107 S.Ct. 2093, 95 L.Ed.2d 693 (1987). Resurrecting the mail fraud conviction adds nothing to Borre's punishment.

Although felony convictions sometimes carry collateral consequences, the prosecutor does not argue that the mail fraud conviction yields a consequence that the conspiracy conviction does not. *Carafas v. LaVallee*, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968), and *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), hold that collateral consequences of a conviction may prevent the expiration of custody from mooting a request for relief. Because no one identifies any actual, even any potential, consequence of the mail fraud conviction once the conspiracy conviction is reinstated, there is no remaining dispute between the parties, and our views are advisory. *Lane v. Williams*, 455 U.S. 624, 631–34, 102 S.Ct. 1322, 1326–28, 71 L.Ed.2d 508 (1982).

I believe that the majority's resuscitation of the mail fraud conviction is incorrect as well as unnecessary. Borre was a nominee in a scheme to give Richard Hamm, the Mayor of Fox Lake, Illinois, 5% of a firm that wanted to operate a cable television system there. This is bribery, or perhaps extortion. The prosecution sought to transmute bribery into mail fraud by urging that Hamm (with Borre's aid) deprived Fox Lake of the intangible right to good government. *McNally* rejects that theory of criminal liability.

Struggling to avoid an adverse precedent rendered after Borre's conviction, the United States has recast its theory. It now says that Hamm, Borre, and the other participants in this venture defrauded Fox Lake of "property"—the cable television franchise. The franchise may be characterized as a contract or a license. Both

---

**17.** Borre also argued that his plea agreement to Counts I & V was a "package deal," and that the collapse of the mail fraud conviction should nullify the conspiracy conviction. We do not need to address this argument, however, in light of our conclusion that the mail fraud conviction is valid.

**18.** Judge Easterbrook in his partial dissent raises some good and practical arguments about

why the judgment of the district court vacating the mail fraud conviction should not be reversed. On balance, however, we believe the mail fraud conviction deserves to stand, though this is a close question, and therefore we prefer to say so even though the practical consequences may be negligible and it would, of course, be much easier to avoid the issue.

contracts and licenses are property for some purposes. But names do not matter. In *McNally* itself the bad guys induced the government to let a contract. Indeed, with the change of a few details, Borre's case is a replay of McNally's. McNally, Gray, and Hunt influenced Kentucky to place its contracts for workers' compensation through a particular broker; the agency paid these gentlemen for their efforts by ceding part of its commissions to firms Hunt designated. The Supreme Court could have said that this scheme defrauded the Commonwealth out of its property—the insurance contracts, or perhaps the money paid under the contracts. Instead it reversed the convictions, demanding that the prosecution show how the scheme deprived Kentucky of something of value.

What anyone *called* the contracts was irrelevant; the question was whether and how Kentucky felt the pinch. "It was not charged that in the absence of the alleged scheme the Commonwealth would have paid a lower premium or secured better insurance. Hunt and Gray received part of the commissions but those commissions were not the Commonwealth's money." *McNally*, 483 U.S. at 360, 107 S.Ct. at 2882. With a few substitutions, this reads directly on Borre's case. The indictment did not charge that in the absence of the scheme Fox Lake would have received a higher franchise fee or secured better or cheaper cable television. Hamm got 5% of the profits, but the cable television supplier's profits were not Fox Lake's money. If the convictions in *McNally* were defective, how is Borre's on sounder footing?

The majority's maneuver of dubbing the CATV franchise "property", and then disregarding the absence of loss to Fox Lake, rings changes on a theme we rejected in *Toulabi v. United States*, 875 F.2d 122 (7th Cir.1989). Toulabi orchestrated a scheme to issue taxi drivers' licenses to persons who did not possess the qualifications set by law. The scheme improved the City's finances—it received license fees it would not have collected had the law been enforced—but deprived it of the honest enforcement of the laws. We held that issuing the license did not itself divest the City of "property". It did not deduct from the coffers. Anyway, we observed, a "license"

is just a public announcement of permission to act. It indicates that the government will leave you alone if you do something.

Although the license may be property from the recipient's perspective, from the government's it is no different from an opinion by the Corporation Counsel that so-and-so meets the standards local law sets for doing such-and-such. Other courts of appeals agree with *Toulabi*, concluding that many different kinds of licenses and permissions are not the kind of property to which *McNally* refers. *United States v. Schwartz*, 924 F.2d 410, 416–18 (2d Cir. 1991) (license to export arms); *United States v. Murphy*, 836 F.2d 248, 253–54 (6th Cir.1988) (bingo permit); *United States v. Granberry*, 908 F.2d 278 (8th Cir.1990) (permit to operate a school bus); *United States v. Kato*, 878 F.2d 267, 268–69 (9th Cir.1989) (aircraft pilot license). Contra, *United States v. Allard*, 864 F.2d 248 (1st Cir.1989) (medical license and internship); *United States v. Martinez*, 905 F.2d 709, 712–15 (3d Cir.1990) (medical license).

Underlying *Toulabi* and like cases is the recognition that licenses improperly issued do not diminish any of the government's interests except that in the accurate enforcement of the law, reflect no loss other than the public's entitlement to the honest services of its employees—and *McNally* held that such deprivations are not mail fraud. This recognition also appears in *Ranke v. United States*, 873 F.2d 1033 (7th Cir.1989), and *United States v. Holzer*, 840 F.2d 1343 (7th Cir.1988). *Ranke* pointedly refers to the possibility that the government lost *money*, that the price paid for services was inflated to cover the bribes, and that the cash had been passed on to Ranke. 873 F.2d at 1039–40. No money passed from Fox Lake to Borre; there is no claim that Fox Lake received lower fees than a bribery-free competition would have fetched.

Illinois law treats franchises and licenses as distinct. Franchises usually are exclusive, while licenses are not. But this difference is not pertinent to the legal analysis established by *McNally*. Whether a

franchise is "property" for purposes of Illinois law is irrelevant: the contract in *McNally* likely was property for purposes of Kentucky law. Neither *McNally* nor *Toulabi* nor any of the cases in the other circuits asks how a state characterizes the document; these cases ask instead how the characteristics of the permission relate to the legal criteria established by the Supreme Court. Having the existence of a federal felony turn on language in musty state cases makes about as much sense as the holding in *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), that the antitrust laws follow the ancient rule against restraints on alienation. *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), overruled *Schwinn* after concluding that state property law is unrelated to the functions of federal antitrust law. So too with the state law of franchises and federal mail fraud prosecutions.

Suppose state law matters. It does not in the end aid my colleagues. Illinois defines as a "franchise" the exclusive delegation of a governmental power to a private person. How is cable television a "governmental" function? Cable television is speech, protected against (certain kinds of) governmental interference by the first amendment. *Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986); *Leathers v. Medlock*, —— U.S. ——, 111 S.Ct. 1438, 1442, 113 L.Ed.2d 494 (1991). Speech is not "property" of the government, lent or given away to speakers. The media of communication are about as far from "delegated governmental powers" as things get. Under the Constitution, the government needs a strong reason to interfere in the operation of a CATV system; the majority, by contrast, treats CATV as if it existed by sufferance of local authorities.

True, the cable operator may need access to the conduits under the streets, but the operator also could install cable on utility companies' poles under the Pole Attachments Act, 47 U.S.C. § 224, see *FCC v.*

*Florida Power Corp.*, 480 U.S. 245, 107 S.Ct. 1107, 94 L.Ed.2d 282 (1987), and the local government could not do anything about this. An operator could install dishes to pick up satellite transmissions. Cable TV operators do not assume public functions; they do not need the government's aid; they only need the government to stay out of their hair. Public promises not to interfere with private conduct, we held in *Toulabi*, are not "property" for purposes of the mail fraud statute.

Before *McNally* the Seventh Circuit was the mail fraud capital of America. We have a copious backlog of intangible rights cases. It is understandable that this institution sees *McNally* as a problem to be overcome rather than a rule to be implemented. Congress, too, is unenthusiastic. It reinstated the intangible rights theory, 18 U.S.C. § 1346, added by § 7603(a) of Pub.L. 100–690, 102 Stat. 4508 (1988), for acts after November 1988. There is no way to avoid *McNally* and *Toulabi* in Borre's case, however—and no reason why we should reinstate a redundant conviction even if there were.