**SEMICONDUCTOR ENERGY LABORATORY CO., LTD.,**
Plaintiff–Appellant,

v.

**SAMSUNG ELECTRONICS CO., LTD.,**
Samsung Electronics America, Inc., and Samsung Semiconductor, Inc., Defendants–Cross Appellants.

Nos. 98–1377, 99–1103.

United States Court of Appeals, Federal Circuit.

March 2, 2000.

As Amended April 5, 2000.

Rehearing and Rehearing En Banc Denied April 26, 2000.

J. Alan Galbraith, Williams & Connolly, Washington, DC; and Joel Davidow, Ablondi, Foster, Sobin & Davidow, P.C., Washington, DC, argued for plaintiff-appellant. With them on the brief was David S. Blatt, Williams & Connolly. Of counsel was Michael T. Brady, Ablondi, Foster, Sobin & Davidow, P.C.

David J. Healey, Tobor, Goldstein & Healey L.L.P., Houston, Texas, argued for defendants-cross appellants. With him on the brief was Gary J. Fischman. Of counsel on the brief were Richard L. Stanley, Arnold White & Durkee, Houston, Texas; and Cecilia H. Gonzalez, Howrey & Simon, Washington, DC. Of counsel was Basil Carl Culyba, Howrey & Simon.

Before MICHEL, Circuit Judge, SKELTON, Senior Circuit Judge, and SCHALL, Circuit Judge.

MICHEL, Circuit Judge.

On October 10, 1996, Semiconductor Energy Laboratory Co., Ltd. ("SEL") sued Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung

Semiconductor, Inc. (collectively "Samsung") in the United States District Court for the Eastern District of Virginia, alleging that Samsung's production and sales of active matrix displays infringed SEL's U.S. Patent No. 5,543,636 ("the '636 patent") directed to semiconductor technology. The district court first granted SEL's motion for summary judgment dismissing Samsung's federal and New Jersey Racketeer Influenced and Corrupt Organizations ("RICO") counterclaims. *See SEL v. Samsung*, 4 F.Supp.2d 473 (E.D.Va.1998) ("*SEL 1* "). After a seven-day bench trial, the district court also held the '636 patent to be unenforceable for SEL's inequitable conduct before the Patent and Trademark Office ("PTO"). *See SEL v. Samsung*, 4 F.Supp.2d 477 (E.D.Va.1998) ("*SEL 2* "); *SEL v. Samsung*, 24 F.Supp.2d 537 (E.D.Va.1998) ("*SEL 3* "). Both parties appeal. Because we are not persuaded that the district court either abused its discretion in holding the '636 patent unenforceable for inequitable conduct or improperly dismissed Samsung's federal and New Jersey RICO counterclaims, we *affirm*.

## BACKGROUND

SEL is a Japanese company specializing in the research and development of semiconductor technology. SEL engages in no manufacturing and supports its research efforts from revenues from patent licensing. Since 1980, SEL has filed over 5,000 patent applications worldwide and has been awarded approximately 1,500 U.S. and foreign patents. Dr. Shunpei Yamazaki, a solid state physicist and the president and majority shareholder of SEL, is the named inventor or co-inventor on most of SEL's patents, including the '636 patent.

Entitled "Insulated Gate Field Effect Transistor" ("IGFET"), the '636 patent claims a non-single crystal silicon thin film transistor ("TFT"), a type of IGFET. Such TFTs can be used to switch the pixels in an active matrix display unit on or off. The TFT includes a source, a drain, a silicon nitride gate insulator, an insulated substrate, and an intrinsic amorphous silicon channel region. The channel region is "sandwiched" between the gate insulator and the insulated substrate. By limiting the level of oxygen, carbon, or nitrogen in the channel region to an amount not exceeding $5 \times 10^{18}$ atoms/cm$^3$, the claimed invention greatly improves the TFT's electrical properties and consequently overcomes potential deficiencies, such as hysteresis (blurring).

The application for the '636 patent was filed on June 7, 1995, and the '636 patent itself issued on August 6, 1996; SEL alleges a much earlier priority date of May 18, 1984, however. Gerard Ferguson, SEL's patent attorney, prosecuted the application for the '636 patent and its ancestor applications, except for a brief period when Dr. Yamazaki revoked his power of attorney because Mr. Ferguson sought to submit certain material prior art references to the PTO.

The '636 patent began as a former 37 C.F.R. § 1.60 (1995) ("Rule 60") divisional application, and thus had its own Information Disclosure Statement ("IDS").[1] The IDS, filed on November 15, 1995, was fifteen pages long. The IDS was accompanied by a Form PTO–1449 listing ninety references that it wished to make of record, each of which the examiner initialed. These references included Japanese Laid–Open Application No. 56–135968, assigned to Canon K.K. ("the Canon reference"). In the IDS, SEL submitted the entire 29-page Canon reference in its original Japanese, a concise explanation of its relevance,

---

1. Under former Rule 60, a divisional application included a copy of the previous application, but did not include the previous file wrapper. By contrast, a 37 C.F.R. § 1.62 (1995) ("Rule 62") continuation application required the application to "utilize the file wrapper and contents of the prior application." 37 C.F.R. § 1.62(e).

and an existing one-page partial English translation from a prior unrelated patent application. The concise explanation succinctly described the Canon reference as disclosing "the use of silicon nitride for a gate insulating layer of a thin film transistor." The one-page partial translation covered four short sections of the Canon reference describing a TFT structure, a semiconductor layer consisting of amorphous silicon, a gate electrode coated with silicon nitride, and an empirical observation of the effect of substituting silicon oxide for silicon nitride. SEL also made of record three references that a potential licensee, IBM, had brought to its attention as important prior art for obviousness purposes: a 1983 article by C.C. Tsai, entitled "Amorphous Si Prepared in a UHV Plasma Deposition System" ("the Tsai article"), and two of Dr. Yamazaki's solar cell patents, Japanese Patent Laid–Open Application Nos. 59–35423 ("the '423 application") and 59–35488 ("the '488 application"). The Tsai article and the '423 and '488 applications all teach the reduction of impurities below the level claimed in the '636 patent.

On October 10, 1996, SEL filed a complaint in the United States District Court for the Eastern District of Virginia alleging that Samsung's active matrix displays and computers having such displays infringed three of SEL's semiconductor patents: the '636 patent, U.S. Patent No. 5,521,400 ("the '400 patent"), and U.S. Patent No. 5,349,204 ("the '204 patent").[2] Samsung denied infringement and asserted numerous affirmative defenses, including non-enablement, obviousness, best mode violation, and inequitable conduct. Samsung subsequently counterclaimed, charging SEL with federal and New Jer-

sey RICO, antitrust, and unfair competition violations.

SEL moved for summary judgment on Samsung's inequitable conduct defense and on Samsung's RICO, antitrust, and unfair competition counterclaims. The district court granted SEL's motion on the RICO and antitrust counterclaims, but denied it on the inequitable conduct defense and the unfair competition counterclaim.

After a seven-day bench trial, the district court found the '636 patent to be unenforceable for inequitable conduct under two alternative theories. First, the district court determined that, by submitting a concise explanation and a one-page partial translation of the Canon reference that were accurate but misleadingly incomplete, SEL had intentionally withheld the Canon reference from the PTO. *See SEL 2*, 4 F.Supp.2d at 484. The concise statement, for example, identified only the silicon nitride gate as pertinent, and neglected to discuss the Canon reference's admonition to avoid impurities. Second, the district court determined that, by mischaracterizing the Tsai article as applying primarily to solar cells rather than TFTs in arguments to the PTO, SEL had intentionally misled the examiner into believing that the Tsai article was not material. *See id.* at 486.

The district court cited multiple facts as demonstrating SEL's deceitful intent. For example, Kunitaka Yamamoto, SEL's in-house patent agent could not satisfactorily account for his misstatement of the level of impurities discussed in U.S. Patent No. 4,766,477 to Nakagawa ("the Nakagawa reference") during the prosecution of U.S. Patent No. 5,315,132 ("the '132 patent"), which issued on an ancestor application to that of the '636 patent.[3] The

---

2. On March 4, 1998, SEL by stipulation amended its complaint to remove its allegations that Samsung was infringing the '400 and '204 patents, leaving the '636 patent the only patent-in-suit.

3. *SEL 2* provides a genealogy chart clarifying the relationships between the '132 patent, the '636 patent, and interim applications. *See* 4 F.Supp.2d at 497. In short, the '636 patent resulted from a divisional application of U.S.

district court similarly discredited Dr. Yamazaki's claim that he did not comprehend the significance of the Tsai article, since he had described a speech by Dr. Tsai discussing her work as "spectacular," had requested the article from Dr. Tsai in October 1983, and had cited it in a 1984 article in the Journal of Non–Crystalline Solids. Moreover, Dr. Yamazaki's own '423 and '488 applications had expressly stated that the benefits of the low levels of impurities in solar cells also applied to TFTs. Though Dr. Yamazaki had submitted the Tsai article and his '423 and '488 applications to the PTO during the prosecution of the application for the '636 patent and the '455 application, the district court noted that he did so only after IBM, a potential licensee, expressly called its attention to these references. Thus, the district court concluded that "[t]he evidence demonstrate[d] a sophisticated, subtle, and consistent effort to hide the ball from the PTO in a manner plainly at odds with an applicant's duty of candor, good faith, and honesty." *SEL 2,* 4 F.Supp.2d at 496.

In response to SEL's motion to reconsider *SEL 2,* the district court issued a new opinion correcting its previous discussion of the Tsai article. *See SEL 3,* 24 F.Supp.2d at 537. The district court recognized that SEL's misrepresentations with respect to the Tsai reference had actually occurred during SEL's prosecution of the '455 and '494 applications, the two applications immediately preceding the application that resulted in the '636 patent, and were not repeated during the prosecution of the application that resulted in the '636 patent. Relying upon a doctrine of "infectious unenforceability" discussed, but not applied, in *SEL 2,* 4 F.Supp.2d at 493, however, the district court held that SEL's misrepresentations

during the prosecution of the ancestor '455 and '494 applications provided an alternative basis for rendering the '636 patent unenforceable. *See SEL 3,* 24 F.Supp.2d at 545.

## DISCUSSION

### I. Inequitable Conduct

■ Patent applicants are required to prosecute patent applications with candor, good faith, and honesty. *See Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178, 33 USPQ2d 1823, 1826 (Fed.Cir.1995). "[I]nequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Id.* The alleged infringer, whether a defendant in a patent infringement suit or a declaratory judgment plaintiff, must demonstrate by clear and convincing evidence both that the information was material and that the conduct was intended to deceive. *See id.*

■ The court first discerns whether the withheld references or misrepresentations satisfy a threshold level of materiality and whether the applicant's conduct satisfies a threshold showing of intent to deceive. *See id.* If these thresholds are satisfied, the trial court balances materiality and intent to determine whether the equities warrant the conclusion that inequitable conduct occurred. *See id.* at 1178, 48 F.3d 1172, 33 USPQ2d at 1827. "In light of all circumstances, an equitable judgment must be made concerning whether the applicant's conduct is so culpable that the patent should not be enforced." *Id.*

■ We may reverse a determination of inequitable conduct only if it is based on

Patent Application No. 425,455 ("the '455 application"), which in turn was a continuation of U.S. Patent Application No. 214,494

("the '494 application"), which in turn was a divisional application of the application which resulted in the '132 patent.

"clearly erroneous findings of fact or on a misapplication or misinterpretation of applicable law, or evidences a clear error of judgment on the part of the district court." *Id.* We review the district court's subsidiary determinations of materiality and intent for clear error, and may disturb them only if we are left with "a definite and firm conviction" that the district court committed a mistake. *Id.* We review a district court's ultimate determination of inequitable conduct under an abuse of discretion standard. *See id.*

### A. Materiality

■ 37 C.F.R. § 1.56 (1995) ("Rule 56") defines information as material to patentability when:

[I]t is not cumulative to information already of record or being made of record in the application, and

(1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or

(2) It refutes, or is inconsistent with, a position the applicant takes in:

 (i) Opposing an argument of unpatentability relied on by the Office, or

 (ii) Asserting an argument of patentability.

A withheld reference may be highly material when it discloses a more complete combination of relevant features, even if those features are before the patent examiner in other references. *Molins,* 48 F.3d at 1180, 33 USPQ2d at 1828.

■ Reiterating many of its arguments before the district court, SEL contends that the untranslated portions of the Canon reference were not material to patentability because they were cumulative to other information. More particularly, SEL alleges that the Canon reference only discloses a conventional IGFET device and generally teaches the avoidance of impurities on the surface of the intrinsic semiconductor layer. SEL also contends that the Canon reference, whether alone or combined with other references, would not have established a prima facie case of unpatentability, since it does not disclose the maximum impurity level of oxygen, nitrogen, or carbon in the channel region for overcoming the hysteresis problem.

We discern no clear error in the district court's finding that the Canon reference was material. The district court cited several reasons for finding the Canon reference to be material to patentability. First, the district court found that the Canon reference was not cumulative, since the untranslated portions of Canon contained a more complete combination of the elements claimed in the '636 patent than anything else before the PTO. Specifically, the Canon reference discloses the intrinsic amorphous silicon layer, the silicon nitride gate insulator, the sandwich structure, and the key admonition to avoid impurities in semiconductor materials, each of which is claimed by the '636 patent. Second, the district court found that the Canon reference established a prima facie case of unpatentability in combination with other information, particularly the teachings of the Tsai article or Dr. Yamazaki's own '423 or '488 applications. As Samsung's expert, Dr. Fonash, explained, a fully translated Canon reference would have provided a "good blueprint" for making the exact device described by the '636 patent. Consequently, taken together with the Tsai article, the Canon reference would have rendered obvious the asserted claims of the '636 patent.

### B. Intent

■ "Intent need not be proven by direct evidence; it is most often proven by a showing of acts, the natural consequence of which are presumably intended by the

actor." *Molins*, 48 F.3d at 1180, 33 USPQ2d at 1828–29. "Generally, intent must be inferred from the facts and circumstances surrounding the applicant's conduct." *Id.* at 1180–81, 48 F.3d 1172, 33 USPQ2d at 1829. "Since the fact-finder has personally heard and observed the demeanor of witnesses, we accord deference to the fact-finder's assessment of a witness's credibility and character." *Id.* at 1181, 48 F.3d 1172, 33 USPQ2d at 1829.

 Proof of high materiality and that the applicant knew or should have known of that materiality makes it difficult to show good faith to overcome an inference of intent to mislead. *See Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1257, 43 USPQ2d 1666, 1669 (Fed.Cir.1997). "The more material the omission or the misrepresentation, the lower the level of intent required to establish inequitable conduct, and vice versa." *Id.* at 1256, 120 F.3d 1253, 43 USPQ2d at 1668. In evaluating whether the district court clearly erred in its factual finding of deceitful intent, we must assure ourselves that the district court did not overlook mitigating factors. *See Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380, 1384, 47 USPQ2d 1533, 1536 (Fed.Cir.1998).

 Again reiterating its arguments to the district court, SEL argues that it did not intend to mislead the examiner by submitting only a partial translation of the Canon reference and a concise statement not addressing its key teachings, such as

its admonition to avoid impurities. SEL contends that Dr. Yamazaki subjectively believed that the Canon reference was valuable only for its disclosure of the conventional IGFET structure.

As evidence of its good faith, SEL emphasizes that it submitted the entire Canon reference in its original Japanese. SEL also underscores the fact that it meticulously complied with 37 C.F.R. § 1.98(a),(c)[4] (1995) by providing an accurate, concise explanation of the relevance of the Canon reference and a pre-existing partial translation. SEL further claims that Manual of Patent Examining Procedure ("MPEP") § 609 establishes "permissive," "non-burdensome," "free of risk," and "gently suggestive at best, and certainly not mandatory" standards for foreign language references. For example, SEL notes that MPEP § 609 does not require that the applicant discuss differences between the cited information and the claims. *See* MPEP § 609A(3); *see also* Duty of Disclosure, 57 Fed.Reg. 2021, 2026, cmts. 24 & 26 (1992) (stating that Rule 56 does not require that applicant combine references against its own claims or analyze references.). According to SEL, its technical compliance with the PTO Rules should weigh against an inference of intent to deceive the examiner. *Cf. Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 939, 15 USPQ2d 1321, 1327 (Fed.Cir.1990) (holding that amendment made as of right under MPEP weighs against an inference of intent to deceive). As further proof of its good

---

4. Rule 98 ("Content of information disclosure statement") provides in pertinent part:
 (a) Any information disclosure statement filed under § 1.97 shall include:
 . . . .
 (3) A concise explanation of the relevance, as it is *presently understood* by the individual designated in § 1.56(c) most knowledgeable about the content of the information, of each patent, publication, or other information listed that is not in the English language. The concise expla-

nation may be either separate from the specification or incorporated therein.
 . . . .
 (c) ... If a written English-language translation of a non-English document, *or portion thereof*, is *within the possession*, custody, or control of, or is readily available to any individual designated in § 1.56(c), a copy of the translation shall accompany the statement.
 (emphasis added.)·

faith, SEL highlights the fact that it voluntarily provided the Canon reference to the PTO without any prodding from a licensee (e.g., IBM).

We discern no clear error in the district court's finding that SEL willfully misrepresented the Canon reference. As a general matter, we first note that the district court found Dr. Yamazaki and SEL's other witnesses to be not credible. Instead, the district court credited the testimony of Samsung's witnesses over that of SEL's whenever there was a conflict. The district court further found that Dr. Yamazaki, a solid state physicist whose native language is Japanese, understood the materiality of the Canon reference. The district court also determined that Dr. Yamazaki knew that a more complete translation or concise explanation of the relevance of the Canon reference would decrease the likelihood of the '636 patent being issued, given his understanding of the Canon reference and his immense experience in prosecuting patents. The district court thus concluded that Dr. Yamazaki must have consciously decided which sections to reveal to the PTO through SEL's partial translation.

Though SEL repeatedly highlights those actions that are not improper, SEL cannot overcome a finding of deceitful intent merely by showing that it did certain things properly. Rather, SEL must explain its conduct in failing to provide a more complete translation or concise explanation of the Canon reference. This it simply does not do. As the district court noted, "the record as a whole reflects a clear pattern and practice of initial disclosure, followed by incremental disclosure only when compelled by the circumstances to do so, followed, at times, by mischaracterization." *SEL 2*, 4 F.Supp.2d at 496.

SEL's technical compliance with Rule 98 and its entreaty to MPEP § 609A(3) lend it little aid. Though Rule 98 requires that the applicant provide any existing translation of a foreign reference, Rule 98 provides neither a safe harbor nor a shield against allegations of inequitable conduct. As the district court explained, Rule 98 merely "provides a floor for required submissions of translations of foreign applications, not a ceiling; it is by no means an excuse or license for concealing material portions of a prior art reference." *SEL 3*, 24 F.Supp.2d at 541. The district court found that Dr. Yamazaki knew that the Canon reference disclosed the important admonition to avoid impurities and that the preexisting, one-page partial translation did not discuss this teaching. Given the critical absence of this teaching from the partial translation and his knowledge of this absence, "[i]t was incumbent upon [Dr. Yamazaki] to provide the PTO with sufficient information for a reasonable examiner to consider the [submission] in context, not with a selective and misleading disclosure. The inventor[ ] failed to do that and cannot post facto hide behind the MPEP guidelines to argue that what [he] did with a purpose should be disregarded." *Refac Int'l, Ltd. v. Lotus Dev. Corp.*, 81 F.3d 1576, 1584, 38 USPQ2d 1665, 1672 (Fed.Cir.1996).

Similarly, MPEP § 609A(3) merely indicates that "[t]he concise explanation may indicate that a particular figure or paragraph of the patent or publication is relevant to the claimed invention. It might be a simple statement pointing to similarities between the item of information and the claimed invention." Thus, though MPEP § 609A(3) allows the applicant some discretion in the manner in which it phrases its concise explanation, it nowhere authorizes the applicant to intentionally omit altogether key teachings of the reference. If, as SEL suggests, the concise statement requirement allowed applicants to selectively disclose what they know as long as what they selected for disclosure was accurate, applicants could easily mislead the

examiner by explaining all but one of the relevant elements, thereby leaving the examiner with the impression that the reference did not anticipate, render obvious, or otherwise make unpatentable the claimed invention.

## C. Failure to Disclose

 Finally, SEL contends that, because it submitted the entire untranslated Canon reference to the PTO, it cannot be deemed to have withheld the reference from the examiner. *See Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 1582, 18 USPQ2d 1001, 1015 (Fed.Cir.1991) ("When a reference was before the examiner ..., it can not be deemed to have been withheld from the examiner."). SEL notes that the PTO does not require applicants to translate foreign references into English. *See* MPEP § 609C(2) ("The examiner should not require that a translation be filed by the applicant."). SEL thus claims that it cannot be faulted for not providing a more complete translation of the Canon reference.

SEL argues that the examiner, who is presumed to have done his job correctly, must also be presumed to have read and understood the Canon reference in its native Japanese. *See Molins,* 48 F.3d at 1184, 33 USPQ2d at 1832 (absent proof to the contrary, court assumed that examiner had considered a post-issuance, English-language submission under 37 C.F.R. § 1.501 that the examiner had initialed). SEL emphasizes that the PTO maintains a staff of translators and that an examiner "may request translations throughout the examination process." *Gambro Lundia AB v. Baxter Healthcare Corp.,* 110 F.3d 1573, 1582, 42 USPQ2d 1378, 1386 (Fed. Cir.1997).

We perceive no clear error in the district court's conclusion that SEL effectively failed to disclose the Canon reference to the PTO by providing a one-page, partial translation of the entire 29–page application. By submitting the entire untranslated Canon reference to the PTO along with a one-page, partial translation focusing on less material portions and a concise statement directed to these less material portions, SEL left the examiner with the impression that the examiner did not need to conduct any further translation or investigation. Thus, SEL deliberately deceived the examiner into thinking that the Canon reference was less relevant than it really was, and constructively withheld the reference from the PTO. SEL's submission hardly satisfies the duty of candor required of every applicant before the PTO.

SEL's contention that the examiner must have both read and fully understood the entire untranslated Canon reference based on his having read the misleadingly incomplete one-page translation and concise statement is absurd. Though the examiner is indeed presumed to have done his job correctly, there is no support in the law for a presumption that the examiner will understand foreign languages such as Japanese or will request a costly complete translation of every submitted foreign language document, particularly in the absence of any reason to do so. Rather, as MPEP § 609C(2) reveals, the examiner's understanding of a foreign reference is generally limited to that which he or she can glean from the applicant's concise statement:

> Information which complies with requirements as discussed in this section but which is in a non-English language will be considered *in view of the concise explanation submitted* (A(3) above) *and insofar as it is understood on its face;* e.g., *drawings, chemical formulas,* in the same manner that non-English language information in Office search files is considered by examiners in conducting searches. *The examiner need not have the information translated unless it ap-*

*pears necessary to do so.* The examiner will indicate that the non-English language information has been considered in the same manner as consideration is indicated for information submitted in English. The examiner should not require that a translation be filed by applicant. *The examiner should not make any comment such as that the non-English language information has been considered to the extent understood, since this fact is inherent.*

(emphasis added). Consequently, while the examiner's initials require that we presume that he or she considered the Canon reference, this presumption extends only to the examiner's consideration of the brief translated portion and the concise statement.

SEL's contention that the PTO should not require applicants to translate all foreign references into English misses the critical point. The duty at issue in this case is the duty of candor, not a duty of translation. The duty of candor does not require that the applicant translate every foreign reference, but only that the applicant refrain from submitting partial translations and concise explanations that it knows will misdirect the examiner's attention from the reference's relevant teaching. Here, the desirability of the examiner securing a full translation was masked by the affirmatively misleading concise statement and one-page translation.

■ Thus, we discern no clear error in the district court's findings with respect to materiality and intent, and hold that the district court did not abuse its discretion in finding the '636 patent to be unenforceable for SEL's inequitable conduct in providing a misleadingly incomplete, partial translation of the Canon reference and a narrow and incomplete concise statement. Given our holding that the '636 patent is unenforceable in light of SEL's inequitable conduct with respect to the Canon reference,

we expressly decline to reach the district court's alternative determination of "infectious unenforceability" based on SEL's misconduct during the prosecution of the '455 and '494 applications.

## II. Federal and New Jersey RICO Counterclaims

■ Samsung cross-appeals the district court's grant of summary judgment dismissing its federal and New Jersey RICO counterclaims. We review a grant of summary judgment without deference, reapplying the same legal standard as the district court to the same record before it and . drawing all reasonable inferences in favor of the non-moving party, here Samsung. *See Ford Motor Co. v. United States,* 157 F.3d 849, 854 (Fed.Cir.1998).

### A. Federal RICO

The asserted sections of the federal RICO statute provide:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

. . . .

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962. Section 1962(a) makes it illegal to *invest* the income of racketeering activity. Section 1962(c), by contrast, makes it illegal to *engage* in racketeering activity. Section 1964(c) provides a person with a civil remedy for injuries to business or property from violations of Section 1962.

■ A RICO plaintiff must demonstrate a "pattern of racketeering activity" consisting of at least two instances of racketeering activity. 18 U.S.C. § 1961(5); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1135 (4th Cir.1993). Mail and wire fraud both qualify as predicate acts under the federal RICO statute. *See* 18 U.S.C. § 1961(1). The mail fraud statute makes illegal the use of U.S. mail for "any scheme or artifice to *defraud*, or for obtaining money or *property* by means of false pretenses." 18 U.S.C. § 1341 (emphasis added). Similarly, the wire fraud statute makes illegal the use of "wire, radio, or television communication" for "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343.

Samsung alleges a "three-party pass-through fraud structure" wherein SEL committed numerous acts of mail and/or wire fraud on the PTO. Samsung first claims that, long before the '636 patent issued, SEL targeted Samsung as a defendant for a patent infringement suit. Samsung alleges that a competitor of Samsung, a "VIP" client of SEL, then agreed to pay SEL's litigation costs in its suit against Samsung. According to Samsung, SEL made material misrepresentations to the PTO using the U.S. mail and withheld material references from the PTO. Samsung claims that this fraud resulted in the improper issuance of the three originally asserted patents, which SEL in turn has employed to extort Samsung and others. Although Samsung concedes that the direct fraud was perpetrated upon the PTO,

Samsung asserts that it was the indirect but intended victim of this scheme. As a result of this litigation, Samsung claims to have spent millions of dollars on legal fees and design-around efforts and to have sustained injury to its relationships with its customers, who sought assurances that Samsung will indemnify them against potential patent infringement liability claims brought by SEL.

The district court cited *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F.Supp. 1053, 1071–73 (D.Md.1991), *aff'd sub nom. Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130 (4th Cir.1993), as foreclosing inequitable conduct during patent prosecution from qualifying as a required predicate act. In *Akzo*, the RICO plaintiff alleged that the defendants committed predicate acts of mail fraud against the Food and Drug Administration ("FDA") in obtaining its approval of abbreviated new drug applications ("ANDAs"). The *Akzo* court ruled that ANDAs, as unissued licenses, were not property in the government's hands for mail fraud purposes, and thus the defendant's conduct before the FDA did not constitute predicate acts for purposes of the federal RICO statute. *See id.* at 1072–73. The district court viewed ANDAs and patents to be indistinguishable.

On appeal, Samsung distinguishes *Akzo* as involving licenses, in which the government has no financial interest and which therefore are not property. By contrast, under federal patent law and Supreme Court precedent, an issued patent constitutes property. *See* 35 U.S.C. § 261 ("[P]atents shall have the attributes of personal property."); *Hartford–Empire Co. v. United States*, 323 U.S. 386, 415, 65 S.Ct. 373, 89 L.Ed. 322 (1945). Samsung notes that 35 U.S.C. § 261 does not expressly distinguish between a patent in the hands of the patentee or the government. In fact, the federal government is subject to suit when it infringes a patent that it has granted. *See* 28 U.S.C. § 1498(a).

Alternatively, Samsung contends that a patent is actually more closely analogous to a franchise than a license. Whereas a license is a promise by the government not to interfere, see *Toulabi v. United States*, 875 F.2d 122, 125–26 (7th Cir.1989), a franchise is a right that belongs to the government when conferred upon a citizen and that inheres in the sovereign power, see *Borre v. United States*, 940 F.2d 215, 220 (7th Cir.1991). The Seventh Circuit has held that fraud in procuring a franchise is subject to the mail fraud statute. *See Borre*, 940 F.2d at 220. According to Samsung, a patent, like a franchise, enables its owner to exclude others, including the government.

■■■■ We apply our own law to determine whether SEL's conduct before the PTO qualifies as mail fraud for purposes of the predicate acts requirement of the federal RICO statute. *See Pro–Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1574, 37 USPQ2d 1626, 1631 (Fed. Cir.1996) (holding that, though we do not have exclusive jurisdiction over unfair competition claims, our own circuit law nonetheless determines when inequitable conduct also constitutes unfair competition). We agree with the district court that inequitable conduct before the PTO cannot qualify as an act of mail fraud or wire fraud for purposes of the predicate act requirement. In the context of the mail fraud statutes, "the words 'to defraud' commonly refer 'to wronging one in his property rights by dishonest methods or schemes' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" *McNally v. United States*, 483 U.S. 350, 358, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) (quoting *Ham-*

*merschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 68 L.Ed. 968 (1924)).[5] In this case, however, the PTO has not been defrauded of property. Although that "a patent is property, protected against appropriation both by individuals and by government, has long been settled," *Hartford–Empire*, 323 U.S. at 415, 65 S.Ct. 373, an application that has not yet matured into a patent cannot properly be deemed government property.

We also reject Samsung's attempt to analogize a patent to a franchise for purposes of the mail and wire fraud statutes. A franchise involves a transfer of extant rights previously held exclusively by the sovereign. *See California v. Central Pac. R. Co.*, 127 U.S. 1, 40, 8 S.Ct. 1073, 32 L.Ed. 150 (1888). Examples of franchises include cable television and public utilities. *See Borre*, 940 F.2d at 220. By contrast, the patent right to exclude a party from practicing a particular invention is never held by the sovereign, but only by the patentee after issuance.

In short, Samsung has failed to satisfy the predicate act requirement for its federal RICO counterclaims, as SEL's inequitable conduct did not "defraud" the government of any "property" under either the federal mail or wire fraud statutes. Consequently, we hold that the district court properly granted summary judgment dismissing Samsung's federal RICO claims.

**B. New Jersey RICO**

The district court noted that the New Jersey RICO statute was modeled after the federal statute, see *State v. Ball*, 141 N.J. 142, 661 A.2d 251, 258 (N.J.1995), and that its relevant sections, N.J.S.A.

---

5. We note that, in 1988, Congress added 18 U.S.C. § 1346 in response to *McNally*. Section 1346 provides:

> For purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to defraud another of the intangible right of honest services.

On appeal, however, Samsung does not argue that SEL's conduct before the PTO was intended to "defraud another of the intangible right of honest services," and thus we do not address the possibility of such defrauding here.

§ 2C:41–2(a),(c), also require proof of a pattern of racketeering activity. In view of its rejection of Samsung's mail and wire fraud allegations as predicate acts with respect to the federal RICO counterclaims, the district court concluded that Samsung's New Jersey RICO counterclaims were similarly deficient.

On appeal, Samsung argues that racketeering under the New Jersey RICO Act includes New Jersey crimes as well as "equivalent crimes under the laws of any other jurisdiction," N.J.S.A. § 2C:41–1.a. Samsung notes that qualifying predicate acts under the New Jersey statute would include forgery and fraudulent practices, *see* N.J.S.A. § 2C:41–1.a(1)(*o*), offering a false instrument for filing, *see* N.J.S.A. § 2C:21–3.b, and making false statements to PTO examiners in violation of federal penal provisions such as 18 U.S.C. § 1001.[6] Samsung contends that the district court ignored these additional state and federal violations and hence improperly dismissed its state RICO claims.

SEL responds that, regardless of the expanded scope of predicate acts under the New Jersey RICO statute, we can still affirm the district court's dismissal of the New Jersey RICO claims on the alternative ground of federal preemption. In dismissing Samsung's federal RICO counterclaims, the district court suggested that RICO claims and the inequitable conduct defense are mutually exclusive remedies. The district court noted that the affirmative defense of inequitable conduct supplies an adequate remedy by rendering the patent unenforceable and possibly also entitling the alleged infringer to attorney fees under 35 U.S.C. § 285.

Samsung disputes that the federal patent laws preempt its state RICO counterclaims, noting that the patent statute nowhere expressly excludes RICO remedies. Samsung claims that SEL's misconduct is not a "garden-variety" instance of inequitable conduct, and emphasizes the Supreme Court's recognition of concurrent RICO and state law remedies for a single activity. *See Humana, Inc. v. Forsyth,* 525 U.S. 299, 303, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999) (holding that the McCarran–Ferguson Act, which bars application of a federal law in the face of a state law enacted "for the purpose of regulating the business of insurance," did not preclude the concurrent assertion of the federal RICO statute and Nevada insurance law). Samsung also notes that the New Jersey RICO Act states that "[t]he remedies provided in this act shall be cumulative with each other and other remedies at law." N.J.S.A. § 2C:41–6.1.

Samsung underscores the broad remedies available under the RICO statutes. With respect to monetary relief, the patent laws would permit only the recovery of attorney fees, while the New Jersey RICO statute would allow the prevailing plaintiff "threefold any damages he sustains and the cost of the suit, including a reasonable attorney's fee, costs of investigation and litigation." N.J.S.A. § 2C:41–4.c. Samsung asserts that its alleged damages, which include design-around costs and loss of goodwill, are a recognized form of RICO damages. *See, e.g., Khurana v. Innovative Health Care Sys., Inc.,* 130 F.3d 143, 150–51 (5th Cir.1997), *cert. granted, judgment vacated,* and *case dismissed as moot,* — U.S. —, 119 S.Ct. 442, 142 L.Ed.2d 442 (1998).

Finally, Samsung analogizes its New Jersey RICO counterclaims to the state

---

6. 18 U.S.C. § 1001 provides:
 Whoever in any matter within the jurisdiction of any department or agency of the United States knowingly or willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

tort claims held not to be preempted in *Dow Chem. Co. v. Exxon Corp.*, 139 F.3d 1470, 46 USPQ2d 1120 (Fed.Cir.1998). In *Dow*, we held that the state law claim of intentional interference with actual and prospective contractual relationships was not preempted by federal patent law, even though the claim was based partly on acts of alleged inequitable conduct before the PTO. We reasoned that because the state cause of action also included elements not found in the patent infringement defense of inequitable conduct, but in the marketplace against inhabitants of the state, the state tort as applied was not an impermissible attempt to offer patent-like protection. *See id.* at 1477, 139 F.3d 1470, 46 USPQ2d at 1126. Samsung claims that, like the state claim in *Dow*, its RICO counterclaims allege "additional elements not found in the federal patent law cause of action," *id.* at 1473, 139 F.3d 1470, 46 USPQ2d at 1123, such as SEL's targeting of Samsung and its eventual filing of this lawsuit.

We agree with SEL that the federal patent laws preempt Samsung's New Jersey RICO counterclaims. As applied, the state RICO counterclaims in this case are more closely analogous to the state abuse of process counterclaim held to be preempted in *Abbott Labs. v. Brennan*, 952 F.2d 1346, 21 USPQ2d 1192 (Fed.Cir. 1991), than the intentional interference with contractual relationship counterclaim in *Dow*. In *Abbott*, the applicant had committed inequitable conduct by backdating a request for an extension of time and falsely averring that the request had been timely made, resulting in his loss of priority. This court concluded that "the federal administrative process of examining and issuing patents, including proceedings before the PTO's boards, is not subject to collateral review in terms of the common law tort of abuse of process." *Id.* at 1357, 21 USPQ2d at 1201.

Like the state abuse of process claim in *Abbott*, "the wrong alleged and for which state law tort damages [are] sought [is] no more than bad faith misconduct before the PTO." *Dow*, 139 F.3d at 1477, 46 USPQ2d at 1126. As pleaded by Samsung, its New Jersey RICO counterclaims occupy a field identical in scope with the inequitable conduct defense. If the conduct constituting inequitable conduct, without more, could be considered predicate acts under federal or state RICO law, then every accused infringer asserting an inequitable conduct defense would also bring such a RICO counterclaim. An additional state cause of action predicated so squarely on the acts of inequitable conduct would be "contrary to Congress' preemptive regulation in the area of patent law." *Abbott*, 952 F.2d at 1357, 21 USPQ2d at 1201.

Samsung's contention that its New Jersey RICO counterclaims allege additional elements not found in the federal patent law cause of action for inequitable conduct is inaccurate. Samsung conveniently ignores the distinction between acts that *may* be proven as part of a state RICO violation and those which *must* be proven for liability. As applied by Samsung, the New Jersey RICO statute does not contain as necessary elements of the offense the sorts of acts beyond misrepresentations or willful omissions to the PTO that Samsung alleges in this case. To satisfy the predicate act requirement (and indeed all requirements) of the state RICO statute, Samsung alleges only the act of filing a false statement, but this act completely overlaps with the alleged misrepresentations giving rise to its inequitable conduct defense. Samsung's additional allegations that SEL targeted and intended to assert the '400, '204, and '636 patents against Samsung even before these patents issued do not take Samsung's application of the New Jersey RICO statute outside of the ambit of the inequitable conduct defense. Every patent applicant files its application believing it could assert the resulting patent against infringers (or else seeking the

patent would be a worthless endeavor), and it is not unusual for a patent applicant to "target" potential defendants even before the patent issues. *Cf.* MPEP § 708.02(II) (allowing an applicant to file a Petition to Make Special to accelerate prosecution in view of actual infringement by another party). We therefore reject Samsung's attempts to contort the elements of inequitable conduct to satisfy the New Jersey RICO statute, with its stated purpose of combating organized crime. *See* N.J.S.A. § 2C:41–1.1.c.

Thus, we affirm the district court's grant of summary judgment dismissing Samsung's New Jersey RICO counterclaims as preempted by the patent laws of the United States.[7]

## CONCLUSION

The district court did not abuse its discretion in holding the '636 patent unenforceable for inequitable conduct. The district court correctly applied the statute, regulations, and case law, and did not make clearly erroneous findings of fact on materiality and deceptive intent. Under all the circumstances of record, the court did not seriously misjudge the import of the evidence, particularly the degree of materiality as against the level of deceptive intent, in reaching the conclusion that equity warranted rendering the patent unenforceable. In addition, the district court correctly granted summary judgment dismissing Samsung's federal and New Jersey RICO counterclaims, the former as failing to allege legally adequate predicate acts, and the latter as preempted by the patent laws of the United States. Accordingly, we

*AFFIRM.*

---

7. For a civil federal RICO claim under 18 U.S.C. § 1962(c), the RICO "enterprise" must be distinct from the RICO "person," i.e., the defendant. *See Palmetto State Med. Ctr., Inc. v. Operation Lifeline,* 117 F.3d 142, 148 (4th Cir.1997). The district court also dismissed Samsung's federal and state RICO counterclaims on the ground that the alleged SEL "enterprise" consisting of SEL, Dr. Yamazaki, and Mr. Ferguson was insufficiently distinct from the SEL "person." Because we affirm the district court's dismissal of Samsung's respective federal and New Jersey RICO counterclaims as failing to allege a predicate act and as preempted under the circumstances of this case, we decline to reach the correctness of the district court's holding regarding this "enterprise" element.